UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---

WICKAPOGUE 1 LLC, NICOLE GALLAGHER, and
MARK GALLAGHER,

                                 Plaintiffs,

                - against –

BLUE CASTLE (CAYMAN) LTD.

                                 Defendant.

Case No.: 2:23-cv-00561

---

## DECLARATION OF JOHN RAMER

JOHN RAMER, being duly sworn, hereby declares and states:

1.      I am over the age of 18 and competent to testify to the matters stated herein.

2.      I submit this Declaration in opposition to the Order to show cause for a Temporary Restraining Order and Preliminary Injunction (the "**Motion**") [Dkt. # 1] submitted by Wickapogue 1 LLC ("**Borrower**"), Nicole Gallagher ("**Pledgor**"), and Mark Gallagher ("**Guarantor**," collectively with Pledgor, the "**Guarantors**," and with Borrower, collectively, the "**Plaintiffs**").

3.      I make this declaration upon my own knowledge and upon my review of the books and records of defendant Blue Castle (Cayman) Ltd. ("**Blue Castle**") concerning the Loan (defined below) made to Borrower (defined below) in this action.

4.      Unless stated otherwise, all of the facts herein stated are based upon my review of the books and records of Blue Castle. The records and documents I reviewed are maintained by Blue Castle as part of its regularly conducted business activity and were made at or near the time of the recording by someone with knowledge or from information transmitted by someone with knowledge.

5.      The Motion seeks to enjoin defendant Blue Castle from conducting a public auction (the "**Auction**") pursuant to the N.Y. Uniform Commercial Code (the "**UCC**") of Pledgor's membership interests (the "**Membership Interests**") in Borrower under the terms of the Pledge (defined below) given by Borrower and Pledgor to Blue Castle's predecessor in interest, 5 Arch Funding Corp. ("**Original Lender**").

THE LOAN DOCUMENTS

6.      On or about February 7, 2020, Original Lender loaned Borrower the aggregate original principal amount of five million seven hundred fifty thousand and 00/100 dollars ($5,750,000.00) (the "**Loan**"), which is comprised of: (i) a loan in the original principal amount of $3,250,000.00 (the "**Land Loan**"), and (ii) a building loan in the original principal amount of up to $2,500,000.00 (the "**Building Loan**").

7.      The indebtedness for the Land Loan is evidenced that certain Amended and Restated Mortgage Note, dated February 7, 2020, executed by Borrower, in favor of Original Lender, in the original principal amount of $3,250,000.00 (the "**Note**"). A true and correct copy of the Note, with allonge affixed thereto, is annexed hereto as **Exhibit A**.

8.      The Building Loan is evidenced by that certain Amended and Restated Building Loan Mortgage Note, dated February 7, 2020, executed by Borrower in favor of Original Lender, in the original principal amount of $2,500,000.00 (the "**Building Note**" and, together with the Note, collectively, the "**Notes**"). A true and correct copy of the Building Note, with allonge affixed thereto, is annexed hereto as **Exhibit B**.

9.      In connection with the Building Loan, Borrower and Original Lender entered into that certain Amended and Restated Building Loan Agreement, dated February 7, 2020 (the "**Building Loan Agreement**") and filed on February 19, 2020 with the Clerk of Suffolk County

as Seq. No. LMIS00017137. A true and correct copy of the Building Loan Agreement is annexed

hereto as **Exhibit C**.

        10.     Pursuant to the Building Loan Agreement, Borrower acknowledged that any

change, departure or modification from the terms of the Loan Documents must be writing.

> *Section 6.07. Entire Agreement*: Amendments and Waivers. This Loan Agreement and the other Loan Documents contain the entire agreement of the parties with respect to the subject matter hereof and supersede all prior oral or written agreements or statements relating to such subject matter. **None of the terms and provisions hereof or of the other Loan Documents may be changed, waived, discharged or terminated, nor may any material departure from the provisions hereof or thereof be consented to, except by an instrument in writing signed by the party against whom enforcement of the change, waiver, discharge, termination or consent is sought...**

(Exhibit C, Section 6.07) (emphasis added).

> Section 6.18. No Oral Agreements. THIS WRITTEN LOAN AGREEMENT AND THE LOAN DOCUMENTS EXECUTED IN CONNECTION HEREWITH REPRESENT THE FINAL AGREEMENT BETWEEN THE PARTIES **AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES,** AND THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES.

(Exhibit C, Section 6.18) (emphasis added).

        11.     Borrower also waived any right to seek injunctive relief in the connection with

any proceeding brought by Lender. Section 6.13 states:

> *BORROWER FURTHER HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES, IN CONNECTION WITH ANY* SUIT, ACTION OR *PROCEEDING BROUGHT BY OR ON BEHALF OF LENDER WITH RESPECT TO* THIS LOAN AGREEMENT, *THE OTHER LOAN DOCUMENTS OR OTHERWISE IN RESPECT OF THE LOAN, ANY AND EVERY RIGHT BORROWER MAY HAVE TO (W) INJUNCTIVE RELIEF,* (X) A TRIAL BY JURY, (Y) INTERPOSE ANY COUNTERCLAIM THEREIN, OTHER THAN A COMPULSORY COUNTERCLAIM, AND (Z) HAVE THE

SAME CONSOLIDATED WITH ANY OTHER OR SEPARATE SUIT, ACTION OR PROCEEDING. NOTHING CONTAINED IN THE IMMEDIATELY PRECEDING SENTENCE SHALL PREVENT OR PROHIBIT BORROWER FROM INSTITUTING OR MAINTAINING A SEPARATE ACTION AGAINST LENDER WITH RESPECT TO ANY ASSERTED CLAIM.

(Exhibit C, Section 6.13.)

12.     The Note is secured by that certain Mortgage Extension, Consolidation and Modification Agreement, Security Agreement and Assignment of Rents and Leases, made as of February 7, 2020 (the "**Mortgage**"), executed by Borrower in favor of Original Lender, encumbering the real property commonly known as 145 Wickapogue Road, Southampton, NY 11968 (District 0904, Section 020.00, Block 01.00, Lot 026.000 on the Tax Map of Suffolk County) (the "**Premises**") granting Original Lender, among other things, a first priority lien on the Premises and all fixtures, chattels and articles of personal property now or hereafter attached to or located in or upon the Premises, and used or usable in connection with any present or future operation or letting of the Premises or the activities at any time conducted therein (the "**Property**"). A true and correct copy of the Mortgage is annexed hereto as **Exhibit D**.

13.     The Mortgage was duly recorded on September 29, 2020 with the Suffolk County Clerk Records Office (the "**Clerk's Office**") at Liber M00023178, Page 572, Mortgage Number DL028243. (*Id.*)

14.     The Building Note is secured by that certain Building Loan Mortgage Extension, Consolidation and Modification Agreement, Security Agreement and Assignment of Rents and Lease, made as of February 7, 2020, executed by Borrower in favor of Original Lender, encumbering the Premises (the "**Building Mortgage**") and, together with the Mortgage, collectively, the "**Mortgages**") and granting Original Lender, among other things, a lien on the Property. A true and correct copy of the Building Mortgage is annexed hereto as **Exhibit E**.

15.     The Building Mortgage was duly recorded on September 29, 2020 with the Suffolk County Clerk at Liber M00023178, Page 576, Mortgage Number DL028245. (*Id.*)

16.     In the Mortgage, Borrower acknowledged that the terms thereof could not be changed orally.

> This Mortgage may not be changed or terminated orally, the covenants contained in this Mortgage shall run with the land and bind the Mortgagor, the heirs, personal representatives, successors and assigns of the Mortgagor and all subsequent encumbrancers, tenants and subtenants of the Premises; and shall enure to the benefit of the Mortgagee, the successors and assigns of the Mortgagee…

(Exhibits D and E, ¶43).

17.     As further security for the Loan, Nicole Gallagher and Mark Gallagher (collectively, the "**Guarantors**") executed in favor of, and delivered to, Original Lender that certain Guaranty, dated February 7, 2020 (the "**Guaranty**") unconditionally guaranteeing the prompt payment and performance, when due, of all indebtedness or other obligations of the Borrower due under the Loan and the Loan Documents (defined below). A true and correct copy of the Guaranty is annexed hereto as **Exhibit F**.

18.     Also in connection with the Loan, Borrower and Pledgor executed that certain Pledge Agreement, dated February 7, 2020 (the "**Pledge**"), pledging Pledgor's Membership Interests in Borrower to Original Lender. A true and correct copy of the Pledge is annexed hereto as **Exhibit G**.

19.     Pursuant to Paragraph 4.2 of the Pledge (Remedies):

> At any time during the continuance of an Event of Default, the Lender may take any or all of the following actions with respect to the Collateral:
>
> (a) The *Lender may exercise all of the rights and remedies of a secured party under the Uniform Commercial Code* and other applicable law and all of the rights and remedies conferred hereby, it being expressly understood that no such remedy is intended to be

exclusive of any other remedy or remedies, but each and every remedy shall be cumulative and shall be in addition to every other remedy given herein or now or hereafter existing at law or in equity or by statute, and may be exercised from time to time as often as may be deemed expedient by the Lender.

(b) The *Lender shall have the right,* subject to the mandatory requirements of applicable law, *to sell or otherwise dispose of all or any part of the Collateral, at public or private sale* or at any broker's board or on any securities exchange, *for cash, upon credit or for future delivery* as the Lender shall deem appropriate. Each such purchaser at any such sale shall hold the Collateral sold absolutely free from any claim or right on the part of the Pledgor, and the Pledgor hereby waives (to the extent permitted by law) all rights of redemption, stay and appraisal that the Pledgor now has or may at any time in the future have under any rule of law or statute now existing or hereafter enacted.

(*Id.*)(emphasis added.)

20.    Pursuant to Paragraph 4.3 of the Pledge (Method of Sale and Conduct of Remedies).

(a) The Pledgor and the Lender agree that *ten (10) days' notice to the Pledgor of any public or private sale or other disposition of the Collateral or any portion thereof shall be reasonable notice thereof,* and such sale shall be at such locations as the Lender shall designate in such notice and during ordinary business hours, and any other requirement of notice, demand or advertisement for sale, to the extent permitted by law, is hereby waived by the Pledgor. The Lender shall have the right to bid at any public sale.

(*Id.*) (emphasis added).

21.    At the time of entering into the Loan, Pledgor also executed an Affidavit Concerning Business Purpose and Non-Owner Occupancy (the "**Affidavit**"). A true and correct copy of the Affidavit is annexed hereto as **Exhibit H**.

22.    In the Affidavit, Pledgor, on behalf of Borrower swore under oath that the representations and warranties made in the Affidavit were made with the intention that they should be relied upon by Original Lender or its assignee. (*Id.* at ¶¶1, 3, 4, 9).

23.    The Affidavit further states:

6

3. ... Borrower intends to use the Loan proceeds for business purposes, including but not limited to the following: refinance of a fix and flip investment property.

4. Borrower hereby certifies that all of the proceeds of the Loan will be used for business and commercial purposes. None on the Loan proceeds will be used for personal, family, or household purposes. Borrower further acknowledges that Lender would not make the Loan if Borrower intended to use any Loan proceeds for personal, family, or household purposes. Borrower acknowledges that Lender is relying on the Affidavit in the making of the Loan.

...

6. Borrower hereby certifies that:

a. The property is not Borrower's residence.

b. Borrower has, and each of Borrower's principals have, no intention of ever occupying or making the Property the residence of Borrower or any of the Borrower's principals' residence. If Borrower's situation changes in the future, Borrower, or any of its principals, agrees that under no circumstances will Borrower, or any of its principals, occupy the Property in whole, or in part.

...

8. Borrower has at all times orally confirmed to Lender that Borrower is acquiring the Loan for business purposes only, and the Borrower shall not at any time use any Loan proceeds for personal, family or household purposes. Borrower has never made any conflicting oral statement to Lender."

(*Id.*)

## THE ASSIGNMENT AND TRANSFER

24.     On or about February 7, 2020, Original Lender assigned the Loan and Loan Documents to Redwood BPL.

25.     On or about April 27, 2020, Redwood BPL assigned the Loan and Loan Documents to CAF Bridge Borrower MS LLC.

26.     On or about July 13, 2020, CAF Bridge Borrower MS LLC assigned the Loan and the Loan Documents to CAF BRIDGE BORROWER MS 2, LLC.

27.     On or about June 10, 2022, CAF Bridge Borrower MS 2, LLC assigned the Loan and the Loan Documents to Redwood BPL Holdings 2, Inc.

28.     On or about June 10, 2022, Redwood BPL Holdings 2 Inc., assigned the Loan and the Loan Documents to Plaintiff.

29.     The foregoing assignments are evidenced by, among other things, the allonges affixed to the Notes (Exs. A and B, above), and the various assignments of mortgage, each of which have been filed with the Clerk's Office (the "**Assignments of Mortgages**"). True and correct copies of the Assignments of Mortgages are annexed hereto as **Exhibit I**.

30.     As a result of the foregoing allonges and Assignments of Mortgage, Plaintiff is the owner, holder, and assignee of the Notes, the Mortgages, as well as the other Loan Documents.

### THE LOAN MODIFICATION

31.     On or about February 23, 2021, Borrower and CAF Bridge Borrower MS 2, LLC executed a Loan Modification Agreement (the "**LMA**") pursuant to which, among other things, the maturity date of the Loan was extended to October 1, 2021 (the "**Maturity Date**"). A true and correct copy of the LMA is annexed hereto as **Exhibit J**.

32.     In executing the LMA, Borrower, and Guarantors ratified, confirmed, affirmed, and reaffirmed, among other things, Borrower's obligations owing under the Loan Documents, and Guarantors' obligations owing under the Guaranty. (*Id.* at ¶¶4(d) and 12.)

33.     Borrower and Guarantors acknowledged in the LMA that the outstanding principal balance owed by Borrower was $5,299,218.86 (*id.* at Recital D).

34.     The amount of the principal balance in recital D was misspelled as "Five Thousand, Two Hundred and Ninety-Nine Thousand Two Hundred Eighteen Dollars and Eighty

-Six" but the actual number provided immediately thereafter was "($5,299,218.86)" and is the principal balance used by Lender in calculating the amounts owed under the Loan.

35.     Section 4(d) of the LMA further states that:

> all accrued interest, unpaid interest, and other amounts payable hereunder (the *"Outstanding Amount"*) are absolute and unconditional, and that there exists no right of set off, defense, claim, or any other cause of action (collectively referred to as Claims) against Lender which could be asserted to reduce or eliminate any or part of the Borrower's Outstanding Amount, or be sought to gain affirmative relief or damages from Lender, irrespective of whether any such Claims arise out of contract, tort, violation of law or regulations, or otherwise.

(*Id.* at ¶ 4(d)).

36.     Borrower also acknowledged that the liens and security interests of the Loan Documents are valid, subsisting, and enforceable liens and security interests and are superior to all liens and security interest other than those exceptions approved in writing, if any. (*Id.* at ¶ 9.)

37.     The Notes, Mortgages, Building Loan Agreement, Guaranty, Pledge, Affidavit, and LMA, together with all other documents or agreements executed and delivered to Original Lender in connection with the Loan, are collectively referred to as the "**Loan Documents**."

## BORROWER'S DEFAULTS

38.     Pursuant to the Loan Documents, Borrower was obligated to pay all sums due and owing under the Loan Documents, including but not limited to, principal, interest, costs and expenses (the "**Indebtedness**"), in full on the Maturity Date.

39.     Section 4 of the Mortgages provide that if the Indebtedness is not paid on the Maturity Date, interest thereon shall be computed and paid at the rate of 24% per annum (the "**Default Rate**"), calculated on the basis of a 360-day year and paid for the actual number of days elapsed until the entire Indebtedness is repaid in full.

40.     On October 1, 2021, Borrower failed to pay the Indebtedness.

41.     By notice dated February 28, 2022, (the "**Notice of Default**"), Borrower and Guarantors were notified that: (i) the Loan matured on October 1, 2021, (ii) Borrower's failure to timely pay the Indebtedness constituted a default under the Loan Documents, and (iii) interest on the Indebtedness would accrue at the Default Rate. A true and correct copy of the Notice of Default is attached hereto as **Exhibit K**.

42.     Despite the Notice of Default, Borrower has continuously failed to remit payment of the Indebtedness to Plaintiff and remains in default under the Loan Documents.

43.     In addition to failing to pay the Loan when due on the Maturity Date, Borrower is also in default for (i) allowing multiple confessions of judgments, totaling over $8,008,156.69, to be entered against Borrower which were not discharged or bonded within 30 days of entry and which continue to exist against the Borrower; (ii) allowing the placement of additional mortgage liens against the Premises without Original Lender's, or its assignee's, consent; (iii) misrepresentation by Guarantors in the Guaranty that they have paid all taxes that had come due as of the date of the Guaranty. The foregoing are breaches of Sections 18(n), 18(p)(iv), and 18(o) of the Mortgages, respectively.

44.     The foregoing defaultsa constitute defaults under the Pledge. (Exhibit G, ¶4.1(f), stating, "An 'Event of Default' shall exist if any of the following occurs and is continuing…any 'Event of Default' exists under and as defined in the Loan Documents.")

## THE AUCTION

45.     Due to Borrower's default, Blue Castle directed that its counsel serve a Notice of Disposition of Collateral (the "**Notice of Sale**") pursuant to the UCC for the disposition of the Member Interests on Borrower and Pledgor dated November 8, 2022 with delivery on November 10, 2022.  Declaration of Jason A. Nagi, **Exs. A** and **B** thereto).

46.     As is required by UCC §9-613, the Notice of Sale contained the names of the debtor and secured party, the nature of the collateral, the method and date and time of disposition, among other statutory requirements. (*Id.*)

47.     The Notice of Sale scheduled the Auction for January 12, 2023, at the office of Blue Castle's counsel and via Webex. (*Id.*)

48.     The notice and publication period of over sixty days exceeds the ten days that Borrower and Pledgor agreed was reasonable in the Pledge. (Exhibit G, at ¶4.3.)

49.     Blue Castle retained the services of Mannion Auctions, LLC (the "**Mannion Auctions**") as auctioneer and for the publication of the Auction. *See,* accompanying Declaration of Matthew Mannion of Mannion Auctions detailing the efforts undertaken by Mannion Auctions to ensure the Auction was noticed is a commercially reasonable manner.

50.     Blue Castle also retained the services of Rosewood Realty Group ("**Rosewood**") for the purposes of advertising and promoting the Auction in the hopes of attracting the highest number of bidders. *See,* accompanying Declaration of Greg Corbin of Rosewood detailing the efforts of Rosewood to advertise and promote the Auction.

## THE MOTION

51.     On January 12, 2023, Plaintiffs' counsel gave notice to Blue Castle's counsel of their intention to present an Order to Show Cause seeking to enjoin the Auction—the Motion.

52.     The Motion was filed on January 11, 2023 seeking "emergency" relief to stay the Auction.

53.     Any "emergency" was an emergency of Plaintiffs own making due to the fact that Plaintiffs were aware of the noticed Auction for approximately sixty days prior to the filing of the Motion. In fact, Plaintiffs' counsel made reference to the Auction and Blue Castle's attempt to enforce the Pledge under the UCC to Blue Castle's foreclosure counsel during proceedings in

the Foreclosure Action. I am informed such statements were made on at least November 22, 2022 and December 28, 2022.

54.    As of February 9, 2023, the total indebtedness under the Loan is anticipated to be as follows:

| | |
|---|---|
| Loan Maturity Date: 10/1/2021 | |
| Interest Paid to Date: 9/1/2021 | |
| Next Payment Due Date: 10/1/2021 | |
| Unpaid Principal Balance of Loan | $5,299,218.86 |
| Note Interest Rate From Interest Paid To Date 9.2500 % Current Note Interest Rate (May include Default Interest Rate) 24.0000 % | |
| Note Rate Interest Due from 9/1/2021 to 1/26/2023 | $688,972.13 |
| Default Rate Interest Due from 10/2/2021 to 1/26/2023 (@ 14.7500%) | $1,031,323.64 |
| Per diem Interest Rate from 1/26/2023 to 2/9/2023 of $3,532.81 | 49,459.34 |
| Accrued/Unpaid Interest Due (May include Unpaid Default Interest) | $3,456.13 |
| Late Fees Due from Paid-to-Date | $2,042.41 |
| Late Fees Unpaid/Due from Previous Payments | $15,521.05 |
| Unpaid Loan Charges or Advances | $184,613.01 |
| Estimated Payoff Charges from Servicer | $558.50 |
| Estimated Foreclosure Fees and costs | $150,000.00 |
| **Total** | **$7,425,165.07** |

TO THE EXTENT A PRELIMINARY INJUNCTION A BOND IS REQUIRED

55.    Here, as set forth above, the granting of an injunction would cause substantial and irreparable harm to Blue Castle, requiring a significant bond.

I declare under penalties of perjury that the foregoing is true and correct to the best of my knowledge, information and belief.

Dated: February 7, 2023

JOHN RAMER